G. Mark Albright, Esq. (NV Bar No. 1394)
gma@albrightstoddard.com
Kyle W. Fenton, Esq. (NV Bar No. 16235)
kfenton@albrightstoddard.com
Jason Kelly, Esq. (NV Bar No. 17229)
jkelly@albrightstoddard.com
**ALBRIGHT, STODDARD, WARNICK & ALBRIGHT**
801 S. Rancho Drive, Suite D-4
Las Vegas, Nevada 89106
T: 702-384-7111 / F: 702-384-0605

M. Jude Egan, Esq. (Admitted *pro hac vice*)
jude@judeeganlaw.com
**EGAN LAW**
426 Barcellus Avenue, Suite 304
Santa Maria, California 93454
T: 805-332-3984 / F: 805-354-5895

*Attorneys for Plaintiffs,*
*Michael Morse and Jassmo, LLC*

Albright Stoddard Warnick & Albright

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

MICHAEL MORSE, *an individual*; and JASSMO, LLC, *a Nevada limited liability company*,

Plaintiffs,

vs.

THE Hertz CORPORATION, *a Delaware corporation*; Hertz VEHICLES, LLC, *a Delaware limited liability company*; DOLLAR RENT A CAR, INC., *an Oklahoma corporation*; THRIFTY RENT A CAR SYSTEM, LLC, *an Oklahoma limited liability company*; MIARRA SIMPSON, *individually and as an employee of the Hertz CORPORATION*; AMANDA STOVER, *individually and as an employee of the Hertz CORPORATION*; and DOES 2-10, inclusive,

Defendants.

**CASE NO.: 2:25-cv-02482-GMN-NJK**

**AMENDED COMPLAINT TO ADD PLAINTIFF, JASSMO, LLC, AND DEFENDANT, AMANDA STOVER & TO PROPERLY NAME DEFENDANT MIARRA SIMPSON, PREVIOUSLY NAMED AS MIRRA SIMPSON; AND DEMAND FOR JURY TRIAL**

AS Albright Stoddard Warnick & Albright

## I.

## COMPLAINT FOR DAMAGES

1. Plaintiff, MICHAEL MORSE, an individual ("Morse"), and JASSMO, LLC, a Nevada limited liability company ("Jassmo") (at times herein, Morse and Jassmo are collectively, "Plaintiffs"), hereby amends the Complaint, in the first instance, originally filed in the Eighth Judicial District Court, Clark County, Nevada on October 24, 2025, and removed to the above-referenced Court on December 12, 2025, against Defendants, THE HERTZ CORPORATION, a Delaware corporation ("THC"), HERTZ VEHICLES, LLC, a Delaware limited liability company ("Hertz Vehicles"), DOLLAR RENT A CAR, INC., an Oklahoma corporation ("Dollar"), THRIFTY RENT A CAR SYSTEM, LLC, an Oklahoma limited liability company ("Thrifty"), MIARRA SIMPSON, inadvertently and previously sued as MIRRA SIMPSON, individually and as a former employee of The Hertz Corporation ("Simpson"), and AMANDA STOVER, DOE Defendant 1, individually and as an employee of The Hertz Corporation ("Stover"), (at times herein, THC, Hertz Vehicles, Dollar, and Thrifty, are collectively, "Hertz" or the "Hertz Defendants"), and DOES 2-10, who are, or were at all relevant times herein, employees or managers of Hertz or third-party entities relevant to this Action. Plaintiffs make the following allegations upon personal knowledge as to Morse's own acts, and upon information and belief, and investigation, as to all other matters, as follows:

## II.

## INTRODUCTION

2. This is an individual action that follows numerous consumer lawsuits brought to redress and restrain a rental car company for a pattern of misconduct whereby Hertz has falsely accused hundreds of innocent customers of stealing its vehicles — accusations that, for some customers, resulted in arrests, felony charges and jail time, and for Morse, resulted in an accusation of felony vehicle theft (disproven at the field stop by law enforcement) and defamatory comments made in writing to Plaintiffs' employer, causing Plaintiffs to lose their contract of employment. Specifically, lapses in Hertz' rental records led to errors, including failing to properly reflect rental extensions in their computer systems, not rescinding police reports for cars that had been reported

AS Albright Stoddard Warnick & Albright

as stolen and then re-rented, and negligently associating stolen cars with the wrong customer(s). As a result of this routine and systemic mass reporting, without verification or investigation, many innocent customers have been wrongfully detained, arrested, thrown in prison, prosecuted, and had their lives destroyed.

3. In this matter, Morse suffered physical injury (a torn labrum that required surgical intervention), false imprisonment, defamation, lost wages and earnings, and being wrongfully accused of a crime.

## III.

## NATURE OF THE ACTION

4. This Action seeks to recover damages for the injuries sustained by Morse as the direct and proximate result of Hertz' wrongful conduct, negligence, and defamatory statements in connection with its false reporting of stolen vehicles and lapses in rental records which led to Morse being falsely accused of theft, detained, attacked and injured by Hertz employee, Simpson, in a public setting, humiliated in a public setting, accused of a felony crime in a public setting, prosecuted for battery as a result of false statements made by Simpson and Stover, and terminated from Plaintiffs' employment contract with UBER, INC. ("Uber"), whereas Morse was an Uber Driver by and through Jassmo, due to Defendants', and each of theirs, defamatory statements against Plaintiffs.

## IV.

## JURISDICTION AND VENUE

5. Plaintiff Morse filed his Complaint on October 24, 2025, in the Eighth Judicial District Court, Clark County, Nevada, Case No. A-25-931296-C, which was removed by the Hertz Defendants to this Court on December 12, 2025, on the grounds of: (1) diversity of citizenship exists between Morse and the Hertz Defendants, and Simpson; and (2) the amount in controversy Plaintiff Morse alleges his claims exceed $75,000.00, exclusive of interest and costs. Therefore, this Court has jurisdiction pursuant to 28 U.S.C. § 1332(a).

6. Venue is proper in the District of Nevada for this Court because a substantial part of the events or omissions giving rise to the claim occurred within the State of Nevada, namely Morse

AS Albright Stoddard Warnick & Albright

was attacked, injured, defamed, falsely imprisoned, and suffered from Hertz' breach of contract within the State of Nevada.

7. This Court has personal jurisdiction over Hertz because the acts and omissions giving rise to Plaintiffs' claims occurred in and emanated within the State of Nevada and Hertz has substantial business activities and contacts with the State of Nevada. Hertz has sufficient contacts in Nevada, as it conducts a significant amount of its business in the State of Nevada.

8. At all times relevant hereto, Morse had a valid Nevada Driver's License and a Nevada Business license. Morse drove regularly for Uber in Nevada and had a business warehouse and home address in Clark County, Nevada.

**V.**

**PARTIES**

9. Plaintiff Morse, was a resident and citizen of Nevada when the acts alleged herein occurred, including during the time Morse rented the Vehicle subject to Plaintiffs' claims herein, and is now residing in the city of Santa Maria (Santa Barbara County), California. At all times relevant hereto, Morse was employed by Jassmo, owned and operated by Morse, as an Uber driver and operated a separate business, an online seller's warehouse with goods being sold via Amazon.

10. Defendant, THC, is one of the largest vehicle rental companies worldwide. It is a Delaware corporation with its principal place of business at 8501 Williams Road, Estero, Florida 33928. THC conducts business throughout the United States, including in Nevada. THC runs the car rental operations, vehicle control, corporate security, and all other functions pertinent to this Action for itself and its subsidiaries, including Thrifty and Dollar. THC's vehicle control and corporate security departments handle theft reporting for THC, Hertz, Thrifty, and Dollar.

11. Defendant, Hertz Vehicles, is a Delaware limited liability company with principal executive offices located at 8501 Williams Road, Estero, Florida 33928. Hertz Vehicles is the company that is listed as actually owning the vehicles rented out and reported stolen by THC. Hertz Vehicles has substantial business contacts throughout the State of Nevada.

12. Defendant, Dollar, is an Oklahoma corporation with principal executive offices located at 8501 Williams Road, Estero, Florida 33928. Dollar is a subsidiary of THC. Dollar has substantial business contacts throughout the State of Nevada.

13. Defendant, Thrifty is an Oklahoma limited liability company with principal executive offices located at 8501 Williams Road, Estero, Florida 33928. Thrifty is a subsidiary of THC. Thrifty has substantial business contacts throughout the State of Nevada.

14. This Amended Complaint will be amended, or Defendants to be stricken, if necessary, to designate the appropriate Hertz entity(ies) as defendant(s) at such time as Plaintiffs ascertain the ownership structure that includes the vehicle owner, the owner of the lot where the incident occurred, the billing owner and Simpson's and Stover's true employer.

15. Simpson, on information and belief, was an employee of Hertz at all relative times subject to Plaintiffs' Amended Complaint. Simpson, acting within the scope of her employment and on behalf of her employer, physically attacked and committed battery on Morse as Morse sat in his vehicle attempting to leave the parking lot, and causing severe physical injury that required surgical repair, Morse to be falsely imprisoned, and intentionally inflicting severe emotional distress on Morse.

16. While Simpson attacked Plaintiff, Simpson's manager at Hertz, Stover, looked on in support and took no action to stop the attack, giving the impression of supporting the action through Stover's failure to attempt to stop the incident. In addition, Stover called 9-1-1 and reported that Morse had attacked her employee and that he had one of THC's vehicles, implying that Morse was violent and was, at minimum, in wrongful possession of a THC vehicle.

17. Simpson is a Defendant individually and, as her actions were at all times under the supervision of Hertz and Stover, Simpson acted as an agent of Hertz, invoking *respondeat superior* liability for Hertz.

18. Stover is hereby sued in her individual capacity and as an employee of Hertz. Stover's actions, were at all times under the supervision of Hertz and Stover acted as an agent of Hertz, invoking *respondeat superior* for Hertz.

AS Albright Stoddard Warnick & Albright

19. DOES 2-10, inclusive, are individuals or entities whose true names and capacities are currently unknown to Plaintiffs. Plaintiffs will amend this Complaint in the second instance to reflect their true names and capacities when ascertained. Plaintiffs are informed and believe, and thereon allege, that each of the fictitiously named Defendants is responsible in some manner for the occurrences herein alleged, and that Plaintiffs' damages as herein alleged were proximately caused by their conduct.

## VI.

## GENERAL FACTUAL ALLEGATIONS

20. There are numerous problems with how Hertz handles rentals, which lead to wrongful detention, arrest, imprisonment, and/or prosecution of its customers, including Morse. Hertz knows the problems, yet it continues its misconduct. The systemic problems include: (1) failing to properly record rental extensions, (2) not investigating alleged thefts before filing theft reports, (3) reporting vehicles stolen without any knowledge or verification that they are stolen, (4) reporting vehicles stolen that were in Hertz' possession; (5) reporting vehicles stolen that were validly rented to customers, (6) renting “stolen” vehicles to customers, (7) not reconciling the vehicles in its inventory with the vehicles it has reported stolen and/or recovered, (8) failing to follow safeguards against false theft reports; (9) supplying false information in the theft reports; (10) maintaining outdated computer systems that caused false accusations of theft and (11) refusing to issue retractions of false theft reports to law enforcement.

21. As a result of these problems, law enforcement labels innocent customers as felons driving stolen vehicles. When police spot one of these allegedly “stolen” vehicles on the road, the customer is subject to a felony traffic stop, often involving multiple officers surrounding the vehicle with guns drawn. The customer is then treated like a felon and often detained for several hours.

22. On other occasions, like what happened to Morse, employees lure customers in under false pretenses and then attempt to detain them onsite, calling law enforcement and falsely accusing customers of stealing vehicles. Further, Hertz communicates these same false allegations in writing to third-party partners, such as Uber, that the customer is unfit to continue working as a driver for

AS Albright Stoddard Warnick & Albright

the third-party and refuses to issue a retraction, causing the employee to lose employment with Uber, the very reason many of the falsely accused Hertz drivers, such as Morse, rent from Hertz at all.

23. These allegations are not new. They have been alleged and re-alleged in lawsuits across the country. Hertz has admitted publicly and in depositions and trial testimony that it has a problem. It has paid millions to settle claims made by customers who have been wrongfully arrested, detained, jailed and tried for false allegations of vehicle theft. The problem, however, was exacerbated by Hertz' public statements, by its CEO, and in disclosures to shareholders, that the problems had been rectified. They have not.

24. Plaintiffs' punitive damages request is also not novel. Punitive damages have been requested and awarded in other lawsuits against Hertz. Hertz does nothing to address the structural problems inside of its own organization, continuing to offload the cost of repossession of its vehicles to law enforcement, rather than updating its computer and inventory tracking systems.

**A. *Hertz fails to properly record rental extensions*.**

25. Customers, particularly customers such as Plaintiffs, who take advantage of the Hertz/Uber partnership, routinely seek to extend their rentals, including the "rent for 9 weeks and get the 10th week free" program that encourages longer-term rentals. Hertz welcomes the extension. Hertz states that it provides several ways for a customer to extend the rental term, including calling or visiting the local branch, calling the 1-800 number, and/or using the app, but plaintiffs' experience in practice shows that only the leasing branch has the rental file, and no other location can extend or even take a payment. Even when payments are accepted in the national payment system, they are not applied locally, leading to a false allegation of vehicle theft, or an "overdue" notice, and externalizing the cost of "proving" payment to the customer.

26. Hertz provides verbal authorization for the extension, and the customer continues the rental, receiving a text message that tells the customer that the extension has been processed and receiving notification from the credit card issuer that the payment has been processed. This is how the customer knows that the rental has been extended – and is how Plaintiffs knew that Morse's rental had been extended.

27. Hertz' Vehicle Control Unit ("VCU"), the unit responsible for filing police reports, does not have access to the records of local Hertz branches.

28. As a result, Hertz reports customers to law enforcement who rightfully believe they have validly extended their rental as having stolen the vehicle.

29. Because Hertz fails to follow its own policies in place to prevent the filing of false police reports, as alleged below, the VCU is unaware of the extension and proceeds with filing false police reports against innocent customers.

30. In other cases, as happened to Plaintiffs, Hertz' central computer systems delete customer rental extensions and backdate the rental due dates, resulting in false police reports or overdue notices claiming the customer never extended the rental term and leading to arrests, assaults, false 911 calls, and other ignominies. These false police reports are not only caused by Hertz' negligence, but also by Hertz actively backdating rental due dates and deleting customer rental extensions. Because Hertz actively deletes extensions and backdates rental due dates, the customer can only prove they have lawfully rented the vehicle by checking against the customer's own bank transaction records. This is exactly what Morse had to do, was to show law enforcement that he was properly and lawfully in possession of the vehicle to avoid felony arrest.

31. Hertz typically charges customers at the end of the rental term. At the beginning of the rental term, Hertz places an authorization hold on the customer's credit or debit card to secure future payment.

32. When a customer extends the rental term, Hertz attempts to place an *additional* authorization hold on the customer's debit or credit card, oftentimes unbeknownst to the customer, to ensure the customer has sufficient funds or credit to cover the cost of the rental.

31. Sometimes, after agreeing to extend a customer's rental, the authorization hold is not accepted because the customer does not have sufficient funds or credit *at that time* (which is not an indication of the customer's willingness or ability to pay at the end of the rental term). In that case, Hertz—without notifying the customer— automatically deletes the extension date in its central computer system and backdates the due date to the original date. Plaintiffs had a card on file with substantial credit available on it; his typical lease was in excess of $2,000.

33. Hertz then reports the vehicle as stolen or overdue when it is not returned on the original due date, and upon information and belief, denies the customer ever contacted Hertz to extend the rental, even though the customer received notice of a charge from Hertz and believed the extension had gone through. Each lease is for up to eight (8) weeks; at the end of eight (8) weeks, Hertz issues a new contract. The customer retains the vehicle.

**B. *Hertz fails to track inventory and rents "stolen" vehicles*.**

34. Hertz is quick to report a vehicle stolen or overdue when it cannot find it. In most cases, Hertz does not know if the vehicle is actually stolen; it only knows it cannot find the vehicle. These "missing" vehicles are often in Hertz' possession, custody, or control, in a Hertz lot or lawfully rented to a customer. Nonetheless, Hertz reports the vehicle as stolen to law enforcement.

35. Hertz then rents these vehicles as though they are in inventory, leading to reported "stolen" vehicles on the road in customer possession.

**C. *Hertz fails to follow safeguards against false police reports.***

36. When a vehicle is allegedly missing, Hertz' VCU generates a "theft package," which Hertz provides to the police or it places a demand on its staff to recover an "overdue" vehicle, sometimes using force and sometimes calling 911 to have law enforcement respond, as in the instant case.

37. Hertz' policy W7-02 governs its theft reporting process. Portions of W7- 02, such as subparts (a)(4) and (17) and (E), contain sensible and vital safeguards against false reports, but Hertz fails to follow these policies and instructs its employees not to follow the policies.

38. Hertz policy W7-02(a)(17) requires an investigation by a local security manager to confirm the accuracy of theft reports. Hertz, however, instructs the local security managers to skip the local investigation. Additionally, Hertz' VCU training materials actually direct employees to ignore the local investigation requirement of W7-02(a)(17). These unjustified directives result in virtually every theft report being unverified.

39. Indeed, a Hertz corporate designee admitted during a 2017 trial that Hertz instructs corporate security managers to forego the required investigation. A simple investigation by Hertz

AS Albright Stoddard Warnick & Albright

that complied with its own policy would prevent Hertz from falsely reporting vehicles stolen and renting vehicles it reported stolen.

40. Subsection (a)(4) requires the completion of a checklist for every theft report to ensure compliance with all procedures and an accurate report. The checklist catalogues important details such as the vehicle's movement history, last known location, last known renter, and maintenance records. Hertz consistently ignores the checklist requirement when reporting vehicles stolen. On information and belief, Hertz did not complete the required checklist for the vehicles rented by Plaintiff before filing a theft report.

41. Hertz' policies, as noted in the theft packages, also require efforts to repossess the vehicle before reporting the vehicle stolen. None of the theft packages contains any documented effort to repossess a vehicle (beyond a notation that a vendor was hired, of which there are no other records).

42. Hertz reported the vehicle rented to Plaintiffs as stolen with knowledge that the vehicle was not stolen, lured Morse to the Hertz lot under false pretenses and attempted to use force to repossess the vehicle despite Morse having proof that he was lawfully in possession of the vehicle.

**D. *Hertz fails to correct false police reports and false reports to Uber.***

43. Hertz repeatedly refuses to withdraw theft reports, even when it has made an obvious error, which results in customers, like Morse, needlessly dealing with the criminal justice system, spending time and money to fix problems they did not cause. Incredibly, a Hertz spokesperson has admitted to news media that the company refuses to withdraw false police reports to hide the problems with its reports: "Hertz has no mechanism to withdraw a criminal referral because, the company spokesperson said, it has to maintain a relationship of 'integrity and responsibility' with law enforcement. 'In the rare instances this happens, if you report a crime, and you later say it didn't happen, then law enforcement tends not to believe you if you retract it or say you were mistaken,' the spokesperson said. 'Hertz' continued good relationship with law enforcement is important.'"[1]

44. Similarly, Hertz does not retract false theft reports made to Uber. On information and belief, Hertz publishes false theft packages via the VCU to law enforcement and forwards these

[1] *See, SAM WOOD,* "Hertz Accused of Filing False Accusations of Theft", *The Philadelphia Inquirer* (Aug. 3, 2020).

AS Albright Stoddard Warnick & Albright

same theft packages to Uber or its other partners. Uber then, acting upon information gathered from Hertz, without checking its veracity terminates the driver.

45. Plaintiffs had employment with Uber terminated nearly instantaneously after Hertz forwarded Uber the theft package. An Uber lawyer called Morse within 48 hours of the incident, told him he was terminated and refused to discuss anything further with him. Uber refused to reinstate Plaintiffs after receiving the theft package, despite Plaintiffs attempting to demonstrate that Morse was lawfully in possession of the vehicle and that the report was in error. Because Morse was attacked by Simpson, a Hertz employee, for "stealing the vehicle" and wrongfully accused of theft, Morse was charged with battery, for trying to defend himself after being falsely imprisoned and attacked in his vehicle during the attempted repossession. Even if Morse could have proven to Uber that he had not stolen the vehicle, the battery charge (later dismissed) made him unable to continue driving for Uber.

**E. *Hertz maintains outdated computer systems.***

46. Hertz maintains outdated computer systems. Hertz' departments are compartmentalized and do not share information. There is a critical action step missing between the local branches that maintain inventory and the nationwide database that tracks vehicle theft. Because employees are instructed not to conduct vehicle inventory checks at the local offices and they do not share information with the central database, customers, such as Plaintiffs, are left carrying the liability for false reports.

47. Hertz has tried to unify all its various computer systems, but the result has been abject failure. Instead of spending money to replace its broken systems, Hertz has decided to shift the costs for inventory control to the taxpayers and callously expose its customers to unlawful detention and/or arrest. In fact, when Hertz emerged from its bankruptcy under new management, it listed one of its priority tasks as fixing its computer systems.

**F. *Hertz benefits from false police reports.***

48. Hertz realizes that it is exponentially cheaper to file criminal theft reports, even if they are false, than to track down vehicles.

Albright Stoddard Warnick & Albright

49. By reporting vehicles stolen to the police, with little or no investigation or verification, Hertz also gets the following benefits:

a. Hertz avoids spending money on personnel to verify that the theft reports are accurate and search for vehicles;

b. Hertz does not have to spend money to update its rental systems, which are badly out of date;

c. The police immediately recover the vehicle at taxpayer expense, instead of Hertz hiring repossession services; and/or

d. Hertz writes off the rental car and/or makes an insurance claim for the "stolen" property and/or loss of business use. *See* W7-02(F).

**G. *Hertz knows it files false police reports, and, by extension, Hertz knows it sends false theft reports to Uber.***

50. There has been extensive notice to Hertz that it has a serious false theft reporting problem and CEO Scherr announced a settlement of $168 million for falsely accused customers in 2022 and falsely told both media and shareholders that the problem had been rectified. Hertz, however, ignores the problem because fixing it would decrease Hertz' profits.

51. It is cheaper for Hertz to file police reports and have the policy try to recover stolen vehicles than for Hertz to correct its systems and follow its policies to prevent false police reports.

52. Hertz is and has been aware of false theft reporting problems since at least 2016.

53. For example, in or around 2016, various airport police departments held a conference call about deficient theft reports. Several airport police departments reported that Hertz was falsely reporting vehicles as stolen that later turned up on Hertz' lots. As a result, several police departments stopped taking theft reports from Hertz and notified Hertz of these problems.

54. In 2017, two separate juries found Hertz liable for falsely reporting vehicles stolen and, in each case, Hertz was exposed to punitive damages.

AS Albright Stoddard Warnick & Albright

55. There has also been significant nationwide news coverage of Hertz' false theft report problem.[2]

56. Further, in its now completed bankruptcy, where hundreds of police report victims filed claims, a Hertz designee admitted in sworn testimony that Hertz is aware of "inaccuracies" in Hertz' theft reporting.

**H. *Hertz files false police reports and prosecutes customers for an improper purpose.***

57. Hertz' systems are old and not keeping track of inventory and rentals properly. Instead of investing in better tracking systems and spending the time and money to recover vehicles and investigate whether rentals are actually stolen, Hertz is filing police reports so the police recover the vehicle at taxpayer expense. Hertz *knows* that customers will almost certainly end up being arrested and prosecuted.

58. Hertz' scheme seeks to utilize law enforcement as its own private repossession service, subjecting its customers, including Plaintiffs, to significant financial and emotional harm. Hertz is using the police and criminal justice system for an improper purpose, not to bring actual criminals to justice.

59. At all times relevant hereto, Hertz acted by and through its agents, servants, and employees who acted within the scope of their authority and within the course of their employment.

/ / /

/ / /

/ / /

---

[2] *See*, e.g. Laura Layden, "Hertz Accused of Falsely Reporting that Customers Stole Rental Cars," *Naples Daily News/USA Today* (July 23, 2020); Chad Pradelli and Cheryl Mettendorf, "Action News Investigation: Customers Sue Hertz for False Theft Claims," 6ABC Phila. (July 7, 2020); Sarah Buduson, "Hertz Customers Detained, Arrested After Rental Vehicles Mistakenly Reported Stolen," 5ABC Cleve. (May 21, 2019); Katie LaGrone, "Hertz Has A Pattern of Mistakenly Reporting Cars Stolen Leaving Customers Arrested, Attorney Says," ABC Action News – WFTS Tampa Bay (May 9, 2019); Chad Pradelli and Cheryl Mettendorf, "Investigation: Hertz Customers Arrested After Rental Vehicles Mistakenly Reported Stolen," 6ABC Philia. (May 18, 2018). *See also*, e.g., https://www.cbsnews.com/video/customers-allege-rental-car-giant-Hertz-hadthem-falsely-arrested-some-jailed-for-stealing-cars/#x (Nov. 4, 2021); and https://www.cbsnews.com/video/claims-are-mounting-against-Hertz-from-customers-who-saythey-were-wrongfully-arrested-for-rental-car-theft/ (Dec. 9, 2021).

Albright Stoddard Warnick & Albright

## VII.

## SPECIFIC FACTUAL ALLEGATIONS

60. Plaintiffs were jointly a customer of Hertz, renting vehicles for Morse's business as an Uber driver, specifically utilizing Hertz' partnership with Uber for longer-term, weekly EV rentals, including promotions such as "rent for 9 weeks and receive the 10th week free."

61. Hertz partnership with Uber made it cost-effective for Uber drivers to rent electric vehicles from Hertz while driving for Uber, and many Uber drivers rented such vehicles from Hertz.[3]

62. Morse was enrolled in a weekly payment plan with Hertz and consistently made payments, relying on Hertz' text messages and credit card charges as proof that his vehicle was paid for and he had lawful dominion over the vehicle.

63. At the time of the incident, Plaintiffs' banking records and written messages from Hertz show that Morse was current on his weekly rental payments to Hertz.

64. On or around October 23, 2023, Hertz contacted Morse, instructing him to bring the vehicle in for new registration tags; unbeknownst to him, this was a rouse to get him to return an "overdue" vehicle, even though he was current in his payments.

65. On October 27, 2023, Morse brought the vehicle to the Hertz located at 98 E Warm Springs, Las Vegas, NV 89119 (the "Subject Premises" or the "Premises") as instructed. Morse waited for several hours, as is customary at this Hertz location.

66. Morse walked to the second-floor administrative offices and asked Simpson for the registration tags. Simpson informed Morse that Hertz had not processed an extension for his vehicle for the previous 2 weeks. Morse asked Simpson who he needed to speak with to receive credit for payments he had made for the vehicle. Morse had his phone out and opened his mobile Capital One Application to show Simpson that he had been charged for the rental. Simpson was not interested.

67. Simpson told him to "call corporate" and, when Morse asked for the number while holding his phone, Simpson told him to "Google it," displaying rude and escalating behavior. It is

[3] This was, in fact, on information and belief, one of Hertz' business models. *See, for example*, https://www.uber.com/us/en/drive/vehicle-solutions/Hertz/ accessed July 13, 2025.

AS Albright Stoddard Warnick & Albright

important to note that the only office that could process Plaintiffs' extension was the Subject Premises, where Simpson was working.

68. Morse then left Simpson’s office to empty personal property from the vehicle, including nearly $2k worth of meltable chocolates that belonged to his Amazon business. The vehicle was paid until 3:00 PM that day, and LVMPD later confirmed it remained legally Morse's property at the time of the incident.

69. As Morse approached his vehicle, he noted that the Hertz manager, Stover, and several other Hertz employees were present in the parking lot of the Premises.

70. Simpson came from the second floor of the building and approached Morse from behind him, stating, "You are not leaving with this vehicle."

71. When Plaintiff expressed concern about his personal property, Simpson stated, "You can leave them [the chocolates] on the asphalt until your ride comes" and that she would, "Provide a bag for everything else," a solution not agreeable in the Las Vegas heat.

72. Simpson then stood in the entry of the driver's side vehicle door while Morse was seated in the driver’s seat and Simpson physically detained Morse, demanding he exit the vehicle and return it to her.

73. When Morse would not give Simpson the vehicle's (a Tesla) “card key,” Simpson stood at the entrance of the driver door so that Morse could not close the door. Simpson reached into the vehicle, lunging across Morse's body, attempting to take the electronic card key to operate the vehicle. This struggle continued for approximately 10 minutes, with Simpson repeatedly making physical contact as Morse's body was between her and the key. Simpson made no fewer than 20 lunges across Morse's body, trying to take the card key. During the melee, Morse made statements continually to Simpson such as: “What is your problem?”, “Get off me”, “Stop” and “Get the fuck off me.” Simpson continued to escalate the situation; she got more aggressive as she tried to retrieve the vehicle card key.

74. Morse subpoenaed the Tesla camera footage during his criminal prosecution for battery and Hertz claimed it did not exist. Plaintiffs expect evidentiary issues such as this to be resolved in discovery proceedings, since Morse is aware and informed that Tesla cameras inside and

AS Albright Stoddard Warnick & Albright

outside the vehicle will have recorded the incident (as well as Hertz' security cameras at the lot). Later, a THC employee informed law enforcement that the vehicle's cameras would have recorded the incident. Plaintiffs have demanded that Hertz preserve evidence and, because there was a pending criminal matter, Morse subpoenaed evidence from Hertz for that matter (which was dismissed).

75. During this unprovoked assault, Morse, seated in the vehicle, repeatedly tried to push Simpson off him with his left arm, supporting her weight and force. In this melee, Morse sustained severe physical injuries, specifically a torn rotator cuff, which required surgical repair, rehabilitation and time off work for rehabilitation.

76. After failing to retrieve the key card, Simpson lunged in and grabbed Morse's iPhone from the cupholder and ran off with it. Simpson broke Morse's phone while it was in her possession. The responding police officer had to retrieve the broken phone from Simpson.

77. Morse then drove off the Premises, unloaded his property, and returned to the Subject Premises approximately 7 minutes later. Las Vegas Metropolitan Police Department ("LVMPD") was not yet on scene, but Morse later learned that Simpson, Stover, or another Hertz employee called 9-1-1. Morse proceeded to walk the key card to the Hertz office, but Hertz staff blocked his entrance at the guard shack.

78. Someone on the Hertz lot called LVMPD, via 9-1-1, falsely claiming there was an emergency. Plaintiffs have the 9-1-1 recording and transcript from LVMPD. Defendant Stover stated on the call that Morse had "attacked" one of her employees and "is violent". Stover also stted that "he's got one of our cars and everything", and further stated, "he took off real quick in one of our cars," implying that Morse was in wrongful possession of the THC vehicle.

79. Upon arrival, law enforcement investigated the matter. Both Morse and Simpson received citations for battery from LVMPD on or about October 27, 2023. Morse had to prove that he was lawfully in possession of the vehicle until 3:00 PM that day or, on information, he would have been charged with felony vehicle theft. The officer noticed scrapes on Morse's right elbow and a small cut on his finger.

AS Albright Stoddard Warnick & Albright

80. The charges against Morse were later dismissed (Clark County Criminal Case No. 23-CR-083938), while Simpson pled guilty to the charges against her (Clark County Criminal Case No. 23-CR-083958).

81. Simpson falsely alleged to the responding officer that Morse was wrongfully in possession of the vehicle, falsely accusing Morse of felony vehicle theft.

82. LVMPD Officer Cortez verified onsite, while Morse was otherwise detained during the phone call with Capital One, that Morse had made payments and had not wrongfully possessed the vehicle, confirming the falsity of Hertz' accusation and that the vehicle remained legally Morse's property at the time of the incident.

83. Prior to this incident, on or about December 5, 2022, Hertz' CEO, Steven Scherr ("Scherr") publicly acknowledged that Hertz had made mistakes in the past regarding false accusations of vehicle theft and stated that the company, "Will do right where our customers have been negatively affected" and, "Have changed our policies to avoid the possibility of this happening."[4]

84. This promise was also included in Hertz' November 12, 2024 SEC Form 10-Q, which stated that the company had taken "significant steps to modernize and update those policies" designed to ensure no future false claims.[5]

85. Plaintiffs relied on these representations, believing that Hertz had addressed and resolved such systemic issues, and therefore continued his business relationship with Hertz, specifically for Plaintiffs' Uber employment, which was promoted by Hertz via its "rent for 9 weeks and receive the 10th week free" promotions.

86. Subsequent to the incident and without Plaintiffs' knowledge or consent, Hertz communicated in writing to Uber that Morse was not fit to continue his employment, falsely

---

[4] Becky Sullivan, "Hertz Will Pay $168 Million Dollars to Customers It Falsely Accused of Stealing Cars," *NPR National*- https://www.npr.org/2022/12/06/1140998674/hertz-false-accusation-stealing-cars-settlement (Accessed July 28, 2025).
[5] *Id.*

AS Albright Stoddard Warnick & Albright

asserting that Morse had stolen a vehicle. Hertz had an undisclosed information-sharing partnership with Uber that affected Plaintiffs' employment.[6]

87. At the time of this defamatory communication, Morse was an active and successful Uber driver, having driven nearly 10,000 rides and earning over $250,000, sometimes driving more than 100 hours per week. Morse also actively maintained a ridesharing business via the convention centers in which convention goers would hire him privately as a driver, earning approximately equivalent money from that business as he did driving for Uber.

88. As a direct and proximate result of Hertz' false and libelous communication to Uber, Plaintiffs were immediately and wrongfully terminated from Uber and as Morse being an Uber driver, causing significant and ongoing financial damages, including approximately $500,000 in lost wages with Uber for a period of over five years. Morse's appeals to Uber to reinstate his driving privileges were rejected because Hertz would not retract its theft claims against Morse.

89. The physical injuries sustained by Morse, specifically the torn rotator cuff, required surgical repair and have resulted in limited range of motion in his shoulder, reducing his ability to work in his separate business of running an online warehouse selling imported goods. His Amazon business grossed in excess of $1,000,000 annually, with a 30% profit margin. This injury has caused him approximately $300,000 per year in lost wages and profits. Again, five years of lost profits is approximately $1,500,000.

90. Morse also incurred $8,000 in criminal defense attorney fees fighting the false allegations of assault and battery in Las Vegas criminal court, which were ultimately dismissed. He also had to replace his mobile phone broken by Simpson for an additional $1,500.

91. Hertz systematically overcharged Morse for his rentals, including "extras" such as GPS (not necessary in a Tesla) and "late fees," even though Hertz had recently charged him for additional weeks two or three days prior to the incident. Hertz then systematically backdated payments from a previous rental from July 2023. Hertz omitted Morse's payments and then sent him to collections. Plaintiffs received a collections letter about a month after the incident, which was

[6] On information and belief, Uber shares information with other ride-sharing applications; Morse was unable to drive for *Lyft* either.

AS Albright Stoddard Warnick & Albright

the first Morse had ever heard of a July rental being unpaid – in November and he had continued renting from Hertz for both business and leisure travel. Hertz permitting Morse to continue to rent despite its allegation that he had failed to make earlier payments suggests either bad faith and retaliation, or complete incompetence.[7]

92. Despite Morse being current on his payments and possessing final contract receipts showing said payments and a zero balance, Hertz sent Plaintiffs to collections, selling the debt to a third party, damaging Plaintiffs' credit. This selling of a falsely stated "debt" to a third party is more evidence of Hertz failing to communicate between local offices and central computing, offloading costs to customers to defend false claims of failing to pay debts.

93. Hertz' actions, through its employees Simpson and Stover, and its corporate policies and practices, including systematic overcharging, backdating payments, selling debt to third parties, despite Plaintiffs being current on payments, and the failure of other Hertz employees to intervene, were malicious, oppressive, and constituted a reckless disregard for Plaintiffs' rights and safety, warranting an award of punitive damages.

## VIII.

## CAUSES OF ACTION

### COUNT I
### Negligence
### (Hertz and Does 2-10)

94. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

95. Plaintiffs rented vehicles from Hertz in order to drive for Uber, under the Hertz/Uber partnership.

---

[7] Without discovery, Plaintiffs cannot distinguish whether the backdated rental agreements and late fees were retaliation for the incident or gross incompetence. Given that Hertz has been on notice about the problems of backdating rental agreements for several years, Plaintiffs do not believe the analysis changers in either event, because repeated business negligence begins to sound as "reckless indifference" and, in either event, punitive damages are reasonable.

AS Albright Stoddard Warnick & Albright

96. As one of the largest vehicle rental companies worldwide, Hertz had a negligence duty of care to Plaintiffs to engage in reasonable business practices and not to personally injure Plaintiffs, which included:

a. Filing true and accurate police reports for allegedly stolen vehicles;

b. Providing true and accurate information to police regarding allegedly stolen vehicles;

c. Not renting cars reported stolen;

d. Providing accurate information to police;

e. Updating information and correcting false and misleading information provided to police and to partners such as Uber regarding allegedly stolen vehicles;

f. Tracking vehicles reported stolen in Hertz' systems;

g. Maintaining records sufficient to avoid renting vehicles previously reported stolen;

h. Adhering to corporate policies, including W7-02(a)(4) and (17); and

i. Properly reporting and tracking vehicle rentals, including vehicle rental extensions.

97. Hertz breached the negligence duty of care owed to Plaintiffs by, *inter alia*:

a. Filing false police reports for allegedly stolen vehicles;

b. Providing false information to police and to third parties, such as Uber, regarding allegedly stolen or "overdue" vehicles;

c. Renting cars it had reported stolen;

d. Providing inaccurate information to police;

e. Filing police reports for an improper purpose;

f. Failing to update information and correct false and misleading information provided to police and third parties regarding allegedly stolen vehicles;

g. Failing to track vehicles reported stolen in Hertz' systems;

h. Failing to adhere to corporate policies, including W7-02(a)(4) and (17);

i. Failing to properly report and track vehicle rentals, including vehicle rental extensions; and/or

Albright Stoddard Warnick & Albright

j. Filing police theft reports and forwarding these same theft reports to Uber for an improper purpose;

k. Failing to properly notate payments in its computer system, leading to false police reports, false reports of theft to Uber, and false debt collection reports, all of which externalized costs to the customer;

l. Failing to provide a safe environment for its customers to conduct business.

98. Hertz knew it had a serious problem with making false police reports, keeping track of inventory, and renting vehicles it reported stolen. For instance, Hertz was aware of another lawsuit, *Grady v. The Hertz Corp*., Pa. Ct. of C.P. Phil. Cnty., Civ. No. 1511-0380, in which the Plaintiffs alleged similar actions by Hertz and sought punitive damages against Hertz for similar conduct. Hertz failed to correct these issues. It is also aware of the class action lawsuit *Coriana Benson v. Hertz Corporation* Case 2:23-cv-000992 Middle District of Florida, which alleges many similar facts, including the general facts alleged herein, also seeking punitive damages, and Hertz has been made to Answer.[8]

99. Hertz also knew that its personnel were being directed to ignore W7-02(a)(4) and (17) and that police reports contained false information.

100. Thus, Hertz knew or should have known that its conduct would result in Morse's unlawful detention and/or arrest, his loss of employment with Uber and false debt collection actions.

101. Hertz' conduct was not only negligent, but, under the circumstances, with full knowledge of the facts, also grossly negligent, malicious, reckless, willful, and/or wanton, and demonstrated a total indifference to Plaintiffs and a conscious disregard for their rights and safety. Hertz knew or should have known that its conduct had a significant probability of causing substantial harm, which it did.

102. As a direct and proximate result of Hertz' actions and omissions, Plaintiffs were damaged in that Morse was falsely accused of theft, detained, prosecuted, lost his good paying job

[8] Due to Morse's physical injuries and the uniqueness of Simpson's actions, Morse is not a punitive class member of the *Coriana Benson Class Action*, although many of the underlying general facts are the same. These other lawsuits, including settlements with the plaintiffs in those lawsuits, combined with public statements to both the public and shareholders, show that Hertz was aware and informed of the serious nature of its actions and failure to act with regard for its customers.

Albright Stoddard Warnick & Albright

due to Defendants' defamatory communications to a third party, including both law enforcement and Uber, was physically assaulted and battered, suffered physical injury that required surgical intervention, causing further lost wages and business opportunities and expended money on a criminal defense lawyer, only to have his charges later dismissed and suffered severe emotional distress and physical injury that is ongoing.

103. As a direct and proximate result of Hertz' conduct, Plaintiffs will continue to suffer in the future, severe damages, including but not limited to monetary damages, lost wages, an inability to work in his chosen profession, mental anguish, sleeplessness, restlessness, anxiety, humiliation, loss of reputation, depression, and both physical and mental pain, distress, and suffering.

104. Due to the outrageous, malicious, reckless, and intentional nature of Hertz' conduct, Plaintiffs are entitled to punitive damages.

**COUNT 2**
**Civil Battery with Gross Bodily Injury**
**(Hertz, Simpson, and Stover)**

105. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

106. On or about October 27, 2023, Simpson, acting within the course and scope of her employment and/or agency with Hertz, intentionally and without privilege or consent, made harmful or offensive contact with Morse's person.

107. Simpson was in a managerial role at Hertz.

108. Hertz directed Simpson to repossess the vehicle.

109. Hertz failed to properly train employees on how to repossess a vehicle without resorting to force or otherwise communicate to employees that it was their responsibility to repossess vehicles.

110. Other employees, including the branch manager, watched Simpson attempt to repossess the vehicle by force and did nothing to intervene, thereby ratifying her behavior.

AS Albright Stoddard Warnick & Albright

111. As a direct and proximate result of Simpson's battery, Morse suffered severe physical injuries, including a torn rotator cuff, requiring surgical repair, and causing him to miss work from his driving business and separate business running an online warehouse that required physical labor from Plaintiff to operate.

112. As a further direct and proximate result of the battery, Morse has suffered and will continue to suffer pain, suffering, emotional distress, medical expenses, lost wages, and other general and special damages in an amount to be proven at trial.

113. Simpson's actions, at Hertz' direction to repossess the vehicle by force if necessary, and in plain view of the Hertz onsite manager, Stover, and other employees, were extreme and outrageous, and therefore, punitive damages are warranted.

**COUNT 3**
**False Imprisonment**
**(Hertz and SIMPSON)**

114. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

115. On or about October 27, 2023, Simpson, acting within the course and scope of her employment and/or agency with Hertz, intentionally confined Morse within the Hertz Premises without his consent and without legal justification on two separate occasions.

116. Simpson achieved the first confinement by attempting to physically detain Morse in the vehicle, standing in the doorway of the vehicle while committing battery against him and attempting to take his keys to the vehicle and by taking Morse's iPhone, preventing him from leaving the premises.

117. Simpson achieved the second confinement by falsely accusing Morse of vehicle theft and forcing Morse to prove that he was in lawful possession of the vehicle, spending 15-20 minutes with a law enforcement officer proving that he was not wrongfully in possession of the vehicle.

118. Morse was aware of his first confinement and was unable to leave until Simpson absconded with his iPhone.

AS Albright Stoddard Warnick & Albright

119. Morse was aware of his second confinement, when he returned to the Premises, because he could not leave until law enforcement arrived and confirmed his innocence.

120. As a direct and proximate result of the false imprisonment, Morse suffered emotional distress, humiliation, fear, and other general, special and punitive damages in an amount to be proven at trial.

**<u>COUNT 4</u>**
**Breach of Contract based on Fraudulent Misrepresentation**
**(Hertz and Does 2-10)**

121. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

122. Hertz, through its CEO Scherr and other public statements and SEC filings, made material representations that it was addressing and resolving issues related to false accusations of vehicle theft and that such incidents would not happen again. These representations were made with the intent to induce customers, including Plaintiffs, to continue or enter into contractual relationships with Hertz. The statements were further made to reassure shareholders and Board members that the problems had been resolved.

123. Plaintiffs reasonably and justifiably relied on these representations when continuing his business relationship with Hertz, believing that he would not be subjected to such false accusations.

124. Plaintiffs further relied on Hertz' written representations that he was in lawful possession of the vehicle and that Morse's payments were up to date.

125. Plaintiffs were further overcharged and subject to backdating of rental records and payment receipts in an amount to be proven at trial.

126. Hertz' representations were false, as evidenced by Hertz' subsequent false accusation of vehicle theft against Morse, despite his adherence to a weekly payment plan and receipt of "paid in full" messages, and the subsequent battery and false imprisonment of Morse.

AS Albright Stoddard Warnick & Albright

127. Hertz' conduct constitutes a breach of an implied covenant of good faith and fair dealing, as well as a fraudulent misrepresentation that induced Plaintiffs into a continuing contractual relationship.

128. As a direct and proximate result of Hertz' fraudulent misrepresentation and breach, Plaintiffs suffered damages, including but not limited to, the physical battery, false imprisonment, defamation, and resulting lost income and emotional distress of sustained by Morse.

**<u>COUNT 5</u>**
**Defamation (Libel)**
**(Hertz, Simpson, Stover, and Does 2-10)**

129. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

130. On or about the date of the incident (within two days of the incident, because Plaintiffs are unsure of the exact date of transmission of the false theft package), Hertz, through its agents and employees, including Stover, published a false and defamatory statement in writing to Uber, asserting that Morse was not fit to continue his employment due to its (false) allegation of vehicle theft or that the vehicle was "overdue" (which Plaintiffs assert is a term of art for "vehicle theft.").

131. This statement was false. Morse had not stolen a vehicle and was, in fact, compliant with his payment plan and had received "paid in full" messages from Hertz.

132. Hertz published this statement to a third party (Uber) without privilege and without disclosing its information-sharing partnership with Uber to Plaintiffs. Morse was never charged with vehicle theft or anything regarding payments. He was charged with battery because Simpson alleged that she had broken a nail in the melee with Morse.

133. Plaintiffs demanded a police report and case number.

134. On information and belief, once Simpson was back inside her office, Simpson and/or Stover sent a transmittal to Uber, knowing that law enforcement did not arrest or charge Morse for vehicle theft. Hertz sent the transmittal anyway.

AS Albright Stoddard Warnick & Albright

135. Morse spent 15 minutes getting Capital One on a conference call. Officer Cortez of LVMPD wrote it all down. Capital One told Hertz Morse had made his payments.

136. Hertz' statement, made by and through Simpson and Stover, was defamatory *per se*, as it accused Morse of a crime and directly impacted his fitness to continue working in his profession and livelihood.

137. As a direct and proximate result of Hertz' defamatory statement, Plaintiffs suffered special damages, including but not limited to, the immediate wrongful termination from employment with Uber, resulting in significant lost income, and damage to Morse's reputation. Morse also suffered general damages, including emotional distress and humiliation.

138. Under the circumstances in which Hertz was well-aware of its ongoing theft reporting problems, Hertz' actions with regard to the defamatory publication in writing and orally to a known employer about Morse's fitness to continue working for Uber was done intentionally or with reckless disregard, fraud, oppression, and malice, and subjects Hertz to punitive damages.

**COUNT 6**
**Intentional Infliction of Emotional Distress**
**(Hertz, Simpson, Stover and Does 2-10)**

139. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

140. The conduct of Hertz, through its employees and agents, including Simpson and Stover, inclusive of the false accusation of theft, the physical assault, the false imprisonment, the defamatory communication to Uber, the systematic overbilling, and the subsequent collections attempts, was extreme and outrageous.

141. The conduct of Hertz, Simpson, and Stover was particularly outrageous given CEO Scherr's comments to the media and in its SEC filings that Hertz had done wrong by its customers, acknowledged that customers had been injured by Hertz' actions, and his statements that the problems had been rectified, when he knew or should have known that they were not.

Albright Stoddard Warnick & Albright

142. Hertz', Simpson's, and Stover's conduct in falsely reporting the vehicle theft, the battery, the false imprisonment, and the defamatory publication of the false theft package to Uber and to law enforcement was undertaken with the intent to cause, or with reckless disregard of the probability of causing severe emotional distress to Plaintiffs.

143. Hertz', Simpson's, and Stover's actions, after reassurance from CEO Scherr that the problems had been rectified was undertaken with the intent to cause, or with reckless disregard of the probability of causing severe emotional distress to Plaintiffs.

144. The conduct did cause Morse to suffer humiliation and emotional distress and fear in being attacked by a Hertz employee while other employees looked on and did not intervene, being falsely imprisoned, being accused of felony vehicle theft (which was disproven only through bank records and a phone call with law enforcement to Plaintiffs' bank), being accused of battery (which was only dismissed after multiple criminal court hearings), losing his employment with Uber based on Hertz', Simpson's, and Stover's publication to Uber of knowingly false information in the theft package about his fitness to engage in his chosen profession, and leading to physical injury that required surgical intervention.

145. Morse suffered severe emotional distress as a direct and proximate result of Hertz' outrageous conduct.

146. Morse has suffered and will continue to suffer profound emotional distress, anxiety, humiliation, and other related damages in an amount to be proven at trial.

147. Under the circumstances in which Hertz was well-aware of its ongoing theft reporting problems, Hertz' actions with regard to Plaintiffs were done intentionally or with reckless disregard, fraud, oppression, and malice and subjects Hertz to punitive damages.

/ / /

/ / /

/ / /

AS Albright Stoddard Warnick & Albright

## IX.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray for judgment in favor of Morse and Jassmo, and against Defendants, and each of them, as follows:

1. For general and compensatory damages in an amount to be proven at trial, but in no event less than **$5,000,000.00**;

2. For special damages, including lost wages, medical expenses, criminal defense attorney fees, property damage, and other economic losses, in an amount to be proven at trial;

3. For punitive damages in an amount to be proven at trial, but in no event less than **$15,000,000.00**, due to Defendants' malicious, oppressive, and fraudulent conduct;

4. For pre-judgment and post-judgment interest as allowed by law; 149. For costs of suit incurred herein;

5. For reasonable attorneys' fees as allowed by law; and

6. For such other and further relief as the Court deems just and proper.

## X.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

DATED this 13th day of April 2026.

**ALBRIGHT, STODDARD, WARNICK & ALBRIGHT**

*//s// G. Mark Albright, Esq.*

G. MARK ALBRIGHT, ESQ. (#1394)
801 So Rancho Dr, Ste D-4
Las Vegas, NV 89106
T: 702.384.7111 / F: 702.384.0605
gma@albrightstoddard.com

*Attorneys for Plaintiffs,*
*Michael Morse and Jassmo, LLC*

Albright Stoddard Warnick & Albright

**CERTIFICATE OF SERVICE**

Pursuant to Rule 5(b) of the *Federal Rules of Civil Procedure*, I hereby certify that I am an employee of ALBRIGHT, STODDARD, WARNICK & ALBRIGHT and that on this 13th day of April 2026, I caused to be served a true, complete, and correct copy of the foregoing:

**AMENDED COMPLAINT TO ADD PLAINTIFF, JASSMO, LLC, AND DEFENDANT, AMANDA STOVER & TO PROPERLY NAME DEFENDANT MIARRA SIMPSON, PREVIOUSLY NAMED AS MIRRA SIMPSON; AND DEMAND FOR JURY TRIAL**

via electronic submission through the U.S. District Court's Case Management/Electronic Court Filing System, to all Parties and Counsel of Record registered to receive CM/ECF notifications.

*/s/ Lisa Marie Williams*

**Lisa Marie Williams**
An employee of Albright, Stoddard, Warnick & Albright